## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| DANIEL C. MATOUSEK, TERESA J. CANTU and LEAH M. MALONEY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MIDAMERICAN ENERGY COMPANY, THE BOARD OF DIRECTORS OF MIDAMERICAN ENERGY COMPANY, THE PENSION AND EMPLOYEE BENEFITS PLANS ADMINISTRATIVE COMMITTEE OF MIDAMERICAN ENERGY COMPANY and JOHN DOES 1-30.<br><br>Defendants. | **CIVIL ACTION NO.:**<br><br>**CLASS ACTION COMPLAINT** |

## COMPLAINT

Plaintiffs, Daniel C. Matousek, Teresa J. Cantu and Leah M. Maloney ("Plaintiffs"), by and through their attorneys, on behalf of the MidAmerican Energy Company Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.      INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include MidAmerican Energy Company ("MidAmerican" or "Company") and the Board of Directors of MidAmerican Energy Company and its members

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

during the Class Period[2] ("Board") and the Pension and Employee Benefits Plans Administrative Committee of MidAmerican Energy Company and its members during the Class Period ("Committee")[3] for breaches of their fiduciary duties.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees,"* *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

---

[2] As will be discussed in more detail below, The Class Period is defined as November 13, 2014 through the date of judgment.

[3] Effective January 1, 2020, MidAmerican delegated all fiduciary and asset management responsibilities related to the Plan to the Berkshire Hathaway Energy Investment Committee ("Investment Committee"). Both the Investment Committee and the Committee shall be referred to herein collectively as the Committee.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[4]

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time."  *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9.      At all times during the Class Period (November 13, 2014 through the date of judgment) the Plan had at least 963 million dollars in assets under management.  At the end of

---

[4] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

2017 and 2018, the Plan had over 1.1 billion dollars and 1 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

10.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period (November 13, 2014 through the date of judgment) Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs.

12.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

17.    Plaintiff, Daniel C. Matousek ("Matousek"), resides in Princeville, Illinois. During his employment, Plaintiff Matousek participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

18.    Plaintiff, Teresa J. Cantu ("Cantu"), resides in Houston, Texas. During her employment, Plaintiff Cantu participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19.    Plaintiff, Leah M. Maloney ("Maloney"), resides in Coal Valley, Illinois. During her employment, Plaintiff Maloney participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

21.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, and total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

22.     MidAmerican Energy Company is the Plan sponsor and a named fiduciary with a principal place of business being 666 Grand Avenue, Polk County, Des Moines, Iowa 50306.  The December 31, 2018 Form 5500 filed with the United States Department of Labor ("2018 Form 5500") at 1.

23.     MidAmerican, "headquartered in Des Moines, Iowa, safely meets the energy needs of more than 1.6 million customers in Iowa, Illinois, Nebraska and South Dakota.[5]" MidAmerican is "[a] subsidiary of Berkshire Hathaway Energy." MidAmerican has more "than 3,400 dedicated employees serving [its] customers every day across [its] service territory." *Id.*

---

[5] https://www.midamericanenergy.com/aboutourcompany last accessed on November 4, 2020.

24.     The Company, acting through its Board of Directors, appointed the Committee. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.  The Committee is purportedly required to meet each quarter in order to "review each investment option to satisfy itself that the investment is performing in an appropriate manner … ." Statement of 401(k) Plan Investment Policies and Objectives of MidAmerican Energy Company as revised August 2018 ("IPS") at 10. Further, "[t]he Committee is authorized to make changes to the Plan's underlying investment options as it deems necessary or advisable to maintain the interests of the Plan and its participants." *Id.* As will be discussed in detail below, the Committee failed to carry out these fiduciary duties prudently.

25.     Accordingly, the Company had a concomitant fiduciary duty to monitor and supervise the Committee and its members during the Class Period.

26.     MidAmerican also made discretionary decisions to make profit sharing and employer matching contributions to the Plan each year. Employer Discretionary Profit-Sharing Match Contributions are defined in the Plan Document as: "[a]n amount determined in the discretion of the President of Berkshire Hathaway Energy Company equal to a percentage of each Participant's Eligible Contributions … ." MidAmerican Energy Company Retirement Savings Plan as Amended and Restated Effective January 1, 2020 ("Plan Doc.") at 13. Berkshire Hathaway Energy Company is the corporate parent of MidAmerican.[6]

27.     Accordingly, MidAmerican during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority over management or disposition of Plan assets and because it

---

[6] https://www.midamericanenergy.com/aboutourcompany last accessed on November 4, 2020.

exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

28.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### Board Defendants

29.     As detailed above, the Company, acting through its Board of Directors, appointed the Committee.  The Committee is purportedly required to meet each quarter in order to "review each investment option to satisfy itself that the investment is performing in an appropriate manner … ." IPS at 10. Further, "[t]he Committee is authorized to make changes to the Plan's underlying investment options as it deems necessary or advisable to maintain the interests of the Plan and its participants." *Id.* Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

30.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets and because each exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

31.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

### Committee Defendants

32.      As discussed above, the Committee is purportedly required to meet each quarter in order to "review each investment option to satisfy itself that the investment is performing in an

appropriate manner … ." IPS at 10. More specifically, the Committee claims it will review the performance and the expense of each fund in the Plan and remove any fund with excessive fees or which underperform its peers. *Id.* As detailed in the IPS, the Committee claims it will review the "[p]erformance levels over various time periods (e.g., three-month, one-year, three-year, five-year, etc.) … " for each fund in the Plan at least quarterly. *Id.* In addition, the Committee contends that it will examine the expenses of the Plan for the "[a]ppropriateness of fees and expense charged … ." *Id.* As will be discussed in more detail below, the Committee fell well short of the fiduciary goals.

33.      The Investment Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

34.      The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

35.      To the extent that there are additional officers, employees and/are contractors of MidAmerican who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, MidAmerican officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.    CLASS ACTION ALLEGATIONS

36.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules

of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[7]

> All persons, except Defendants and their immediate family
> members, who were participants in or beneficiaries of the
> Plan, at any time between November 13, 2014 through the
> date of judgment (the "Class Period").

37.    The members of the Class are so numerous that joinder of all members is

impractical.  The 2018 Form 5500 lists 5,977 Plan "participants with account balances as of the

end of the plan year."  2018 Form 5500 at 2.

38.    Plaintiffs' claims are typical of the claims of the members of the Class.  Like other

Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of

Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other

Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all

Class members arise out of the same conduct, policies, and practices of Defendants as alleged

herein, and all members of the Class have been similarly affected by Defendants' wrongful

conduct.

39.    There are questions of law and fact common to the Class, and these questions

predominate over questions affecting only individual Class members.  Common legal and factual

questions include, but are not limited to:

A.    Whether Defendants are/were fiduciaries of the Plan;

B.    Whether Defendants breached their fiduciary duties of loyalty and

prudence by engaging in the conduct described herein;

---

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in their
motion for class certification or subsequent pleadings in this action.

C.     Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

40.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

41.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

42.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

43.     MidAmerican established the Plan "for the administration and distribution of contributions made by participating Employers for the purpose of providing retirement benefits for eligible Employees." Plan Doc. at 1. The Plan underwent several amendments since its founding in 1976, with its most recent amendment effective as of January 1, 2020. *Id.*

44.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Plan Doc. at 49.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

### *Eligibility*

45.     In general, regular full-time and part-time employees are eligible to participate in the Plan.  2018 Auditor Report at 6. The 2018 Auditor Report states: "[t]he participants of the Plan include full and part-time salaried and bargaining employees of MidAmerican Energy Company … ." The December 31, 2018 Report of Independent Auditor of the MidAmerican Energy Company Retirement Savings Plan ("2018 Auditor Report") at 5.

### *Contributions*

46.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions.  *Id.*

47.     With regard to employee contributions: "[e]ach year participants can elect a deduction from base salary of 1% to 75% to be contributed to the Plan, subject to certain Internal Revenue Code ("IRC") limitations." *Id.* MidAmerican will make matching contributions to the Plan in any given year. *Id.* As described in the 2018 Auditor Report: "[t]he Company match is 65% of the first 6% of a participant's 401(k) pre-tax or Roth contribution, or a combination of both, or a maximum match of 3.9% of a participant's base salary." *Id.*

48.     Like other companies that sponsor 401(k) plans for their employees, MidAmerican enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

49.     MidAmerican also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

50.     Given the size of the Plan, MidAmerican likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

51.     With regard to contributions made by participants to the Plan, "[p]articipants are immediately vested in their voluntary contributions plus actual earnings thereon." 2018 Auditor Report at 7. Matching contributions made by MidAmerican are subject to hours of continuous service. *Id.* As described in the 2018 Auditor Report "[p]articipants are 100% vested in the Company's matching and discretionary contributions after completing 1,000 hours of service during a plan year." *Id.*

*The Plan's Investments*

52.     In theory, the Committee must "review each investment option to satisfy itself that the investment is performing in an appropriate manner … ." IPS at 10. But in practice, as alleged below, that is not what happened.

53.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, [p]articipants direct the investment of their contributions into various investment options offered by the Plan." 2018 Auditor Report at 6. As described in the IPS, "[t]he Committee is authorized to make changes to the Plan's underlying investment options as it deems necessary or advisable to maintain the interests of the Plan and its participants." IPS at 10.

54.     The Plan's assets under management for all funds as of December 31, 2018 was $1,081,584,300.  2018 Auditor Report at 3.

*Payment of Plan Expenses*

55.     During the Class Period, administrative expenses were paid for using Plan assets. As described in the Trust Agreement: "[a]ll reasonable expenses incurred by or on behalf of the Plan and Trust  … shall be paid or reimbursed from the Trust Fund" Master Trust Agreement between Bank of America, N.A. and MidAmerican Energy Company dated February 27, 2014 ("Trust Agreement") at 5.

## VI.    THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A.  The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

56.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

57.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

58.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

59.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

60.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

### (1) Defendants Failed to Adequately Monitor the Plan's Recordkeeping Expenses

61.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a

practice known as revenue sharing (or a combination of both or by a plan sponsor).  Revenue

sharing payments are payments made by investments within the plan, typically mutual funds, to

the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee

services that the mutual fund company otherwise would have to provide.

62.     Although utilizing a revenue sharing approach is not per se imprudent, unchecked,

it is devastating for Plan participants (e.g., see allegations supra).  "At worst, revenue sharing is a

way to hide fees.  Nobody sees the money change hands, and very few understand what the total

investment expense pays for.  It's a way to milk large sums of money out of large plans by charging

a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In

some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin

Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-

sharing-and-invisible-fees (last visited March 19, 2020).

63.     In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-

case scenario for the Plan's participants because it saddled Plan participants with above-market

recordkeeping fees.

64.     As demonstrated in the chart below, the Plan's per participant administrative and

recordkeeping fees were astronomical when benchmarked against similar plans.

|      | Participants | Direct         | Indirect      | Total          | $PP      |
|------|--------------|----------------|---------------|----------------|----------|
| 2014 | 5791         | $1,820,464.00  | $68,382.00    | $1,888,846.00  | $326.17  |
| 2015 | 5829         | $2,006,540.00  | $177,001.00   | $2,183,541.00  | $374.60  |
| 2016 | 5811         | $2,340,578.00  | $162,990.00   | $2,503,568.00  | $430.83  |
| 2017 | 5787         | $2,557,363.00  | $211,674.00   | $2,769,037.00  | $478.49  |
| 2018 | 5977         | $3,028,860.00  | $110,279.00   | $3,139,139.00  | $525.20  |

65.     By way of comparison, we can look at what other plans are paying for

recordkeeping and administrative costs.

66.     NEPC, a consulting group, recently conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report (referenced above) which took a survey of various defined contribution plan fees.[8]   The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other.   The average plan had $1.1 billion in assets and 12,437 participants.   The median plan had $512 million in assets and 5,440 participants.   *See* Report at 1.

67.     NEPC's survey found that *no plans* with between 5,000 and 10,000 participants paid *more* than $100 in per participant recordkeeping, trust and custody fees.   Report at 10.

68.     Another data source, the *401k Averages Book* (20th ed. 2020)[9] studies plan fees for much smaller plans, those under $200 million in assets.   Although it studies much smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a slightly bigger plan like the Plan should be paying for recordkeeping.   That is because recordkeeping and administrative fees should ***decrease*** as a plan increases in size.   For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant.   *401k Averages Book* at p. 95.   A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.   *Id*., at p. 108.   Thus, the Plan, with over $1 billion dollars in assets in 2018 and over 5,000 participants in 2018, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

---

[8] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey.

[9] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."   *401k Averages Book* at p. 2.

69.     The Plan's total recordkeeping costs are clearly unreasonable as some authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[10]

70.     In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

71.     Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the

---

[10] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2019 Defined Contribution Progress Report at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process).

72.     The fact that the Plan has stayed with the same recordkeeper over the course of the Class Period, and paid the same relative amount in recordkeeping fees, there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2014 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

73.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

### (2)     Many of the Plan's Funds Had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans

74.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (conservatively, plans having above 1 billion dollars in assets).

75.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their

ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [11]

76.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

77.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."  DOL 408(b)(2) Regulation Fact Sheet.

78.     Investment options have a fee for investment management and other services.  With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

---

[11] *See https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf* ("DOL 408(b)(2) Regulation Fact Sheet")

79.     "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[12]

80.     For purposes of evaluating expense ratios of an investment, plan fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other comparable investment funds to similarly situated plans). This type of information can be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant. However, for comparator information to be relevant for fiduciary purposes, it must be consistent with the size of the plan and its relative bargaining power. Large plans for instance are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

81.     According to Vanguard, "[b]enchmarking is one of the most widely used supplements to fee disclosure reports and can help plan sponsors put into context the information contained in the reports." "Best Practices for Plan Fiduciaries," at 37.

82.     "The use of third-party studies provides a cost-effective way to compare plan fees with the marketplace. Plan sponsors may elect to engage a consultant to assist in the benchmarking process. For a fee, consultants can give plan sponsors a third-party perspective on quality and costs of services. It is important to understand the plan (*e.g.,* plan design, active or passive investment management, payroll complexities, etc.) as it relates to the benchmarking information in order to put the results in an appropriate context. By understanding all of the fees and services, a plan sponsor can make an accurate 'apples-to-apples' comparison." *Id.*

83.     Here, the Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

---

[12] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

84.     In some cases, expense ratios for the Plan's funds were *376%* above the ICI Median (in the case of Oakmark Equity and Income Investor) and *82%* above the ICI Median (in the case of PIMCO Total Return Instl Revenue Share) in the same category.  The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans. These excessively high expense ratios are detailed in the chart below:

| Current Fund | ER | Investment Style | ICI Median |
|---|---|---|---|
| Dodge & Cox Stock | 0.52 % | Domestic Equity | 0.30% |
| Oakmark Equity and Income Investor | 0.81 % | Non-target date Balanced | 0.17% |
| PIMCO Total Return Instl Revenue Share | 0.71 % | Domestic Bond | 0.39% |
| Dodge & Cox International Stock | 0.63 % | International Equity | 0.50% |

85.     The high cost of the Plan's funds is even more stark when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

| Current Fund | ER | Investment Style | ICI Average |
|---|---|---|---|
| Dodge & Cox Stock | 0.52 % | Domestic Equity | 0.35% |
| Oakmark Equity and Income Investor | 0.81 % | Non-target date Balanced | 0.30% |
| PIMCO Total Return Instl Revenue Share | 0.71 % | Domestic Bond | 0.30% |
| Dodge & Cox International Stock | 0.63 % | International Equity | 0.48% |

86.     Given the excessive costs of the above funds they should have been replaced during the Class Period.

### (3)     There Have Been Three Underperforming Funds in the Plan From 2014 to 2018

87.     Another indication of Defendants' lack of a prudent process to monitor Plan funds was their failure to remove three underperforming funds during the Class Period: the Dodge and Cox International Stock fund has been in the Plan from 2014 to at least July of 2020. The Oakmark

Equity and Income Investor have been in the plan from 2014 to at least the end of 2018. The Aristotle Small/Mid Cap Growth Fund was added to the Plan in 2016 and remained in the Plan to at least the end of 2018. These funds have underperformed as follows as of June 30, 2020:

| Current Fund | Total Return % (% rank in peer group) | | | |
|---|---|---|---|---|
| | 1-Year | 3-Year | 5-Year | 10-Year |
| Oakmark Equity and Income Investor | -14.48 (96) | -2.14 (92) | 0.48 (89) | 4.65 (83) |
| # of Peers | 694 | 673 | 636 | 523 |
| Dodge & Cox International Stock | -22.28 (59) | 7.42 (70) | -4.39 (72) | 1.61 (28) |
| # of Peers | 339 | 320 | 292 | 234 |
| Aristotle Small Cap Equity I | -27.54 (93) | -6.72 (95) | -- | -- |
| # of Peers | 645 | 625 | -- | -- |

88.     Given the clear underperformance of the above funds, especially during the last five years, and because they had expense ratios considerably above median and average expense ratios, they should have been replaced during the Class Period.

### (4)     Two of the Underperforming Funds Had Lower Cost Better Performing Alternatives

89.     The Plan failed to replace two of the underperforming funds which in 2018 housed over 80 million dollars in Plan assets. These two funds, the Dodge & Cox International Stock ("Dodge International") and the Oakmark Equity and Income Investor ("Oakmark Equity") had nearly identical lower cost alternatives during the Class Period. Dodge International and Oakmark Equity are what's known as actively managed funds. As detailed in a well respected investment journal: "[a]n actively managed investment fund is a fund in which a manager or a management

team makes decisions about how to invest the fund's money.[13]" Thus, the success or failure of an actively managed fund is linked directly to the abilities of the managers involved.

90.     Here, the performance of the managers of both the Dodge International and the Oakmark Equity funds fell well short of acceptable industry standards and they should have been replaced at the beginning of the Class Period or sooner. Failure to do so, cost the Plan and its participants millions of dollars in lost opportunity and revenue.

91.     There were several more superior performing less expensive alternatives available during the Class Period which should have been selected by the Plan. In fact, as detailed in the Chart immediately above in Section VI(A)(3), Oakmark Equity performed worse than at least 89% of its more than 636 peer funds at the 1, 3, and 5 year marks.  Dodge International performed worse than at least 70% of its more than 290 peer funds at the 3 and 5 year marks.

92.     The chart below choses one of these superior performing alternatives and compares them to the Dodge International and Oakmark Equity funds during the Class Period:

| Current Fund | 2020 Exp Ratio | Lower Cost Alternative | 2020 Exp Ratio | % Fee Excess |
|---|---|---|---|---|
| Oakmark Equity And Income Investor | 0.81 % | American Funds American Balanced R6 | 0.26 % | 211.54% |
| Dodge & Cox International Stock | 0.63 % | Vanguard International Growth Adm | 0.32 % | 96.88% |

93.     Not only are the fees excessive for both the Oakmark Equity and the Dodge International funds but the suggested alternative funds outperformed both funds significantly. The difference between the excessive fees paid for these underperforming funds and the suggested alternatives represent more lost savings each year for plan participants and have been compounded

---

[13] https://www.thebalance.com/actively-vs-passively-managed-funds-453773 last accessed on November 12, 2020.

over the years.  The underperformance of Oakmark Equity and Dodge International as compared to the suggested alternatives is represented in the chart below:

| Fund in Plan/Comparator | Average Annual Return | | | | Benchmark Relative | | | |
|---|---|---|---|---|---|---|---|---|
| | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| Oakmark Equity And Income Investor Benchmark: 60% SPY, 40% AGG Composite/ | -0.90% | 2.19% | 5.72% | 6.87% | 2.41% | 4.92% | 3.16% | 1.02% |
| American Funds American Balanced R6 | 9.42% | 8.00% | 9.82% | 10.16% | 13.77% | 11.22% | 7.61% | 4.48% |
| | | | | | | | | |
| Dodge & Cox International Stock Benchmark: iShares MSCI EAFE ETF/ | -9.43% | -5.85% | 2.21% | 3.13% | -9.52% | -6.33% | -2.87% | -1.41% |
| Vanguard International Growth Adm | 49.32% | 16.07% | 18.58% | 10.93% | 49.23% | 15.59% | 13.50% | 6.39% |

94.     As detailed in the chart above, the comparator funds, namely, American Funds American Balanced R6 and Vanguard International Growth Adm, easily outperformed Oakmark Equity and Dodge International at the 1,3,5 and 10 year marks. A prudent fiduciary should have been aware of these better preforming lower cost alternative and switched to them at the beginning of the Class Period.  Failure to do so is a clear indication that the Plan lacked any prudent process whatsoever for monitoring the cost and performance of the funds in the Plan.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Loyalty and Prudence**
**(Asserted against the Committee)**

95.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

96.     At all relevant times, the Committee Defendants and its members ("Prudence/Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

97.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

98.     The Prudence/Loyalty Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants.   Instead, the Prudence/Loyalty Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.

99.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.   Had Defendants complied with their fiduciary obligations, the Plan would not have

suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

100.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

101.    The Prudence/Loyalty Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against the Board and MidAmerican)

102.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

103.    The Board Defendants and MidAmerican (the "Monitoring Defendants") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

104.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

105.    The Monitoring Defendants also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

106.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

(b)    failing to monitor the processes by which the Plan's investments were evaluated; and

(c)    failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

107.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

108.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee.

In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Date: November 13, 2020                    **PUGH HAGAN PRAHM, PLC**

                                           /s/ David J. Bright                 .
                                           David J. Bright, Esquire
                                           425 E. Oakdale Boulevard, Suite 201
                                           Coralville, Iowa 52241
                                           dbright@pughhagan.com
                                           (319) 351-2028
                                           Fax: (319) 351-1102

                                           **CAPOZZI ADLER, P.C.**

                                           /s/ Donald R. Reavey              .
                                           Donald R. Reavey, Esquire
                                           PA Attorney ID #82498
                                           (*Pro Hac* Admission to be Requested)
                                           2933 North Front Street
                                           Harrisburg, PA 17110

donr@capozziadler.com
(717) 233-4101
Fax (717) 233-4103

<u>/s/ Mark K. Gyandoh           </u>.
Mark K. Gyandoh, Esquire
PA Attorney ID # 88587
(*Pro Hac* Admission to be Requested)
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
markg@capozziadler.com
(610) 890-0200
Fax (717) 233-4103

Counsel for Plaintiffs and the Putative Class